UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil No. 05-0213-N-EJL |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| vs. | ) | |
| | ) | |
| RON and MARY PARK, husband and wife, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On March 17 - 19, 2009, the Court held a bench trial in this matter.   Having reviewed the record in this matter, the Court is now prepared to issue its Memorandum Decision and Order.

Findings of Fact

1. The Ninth Circuit remanded this case for further proceedings after determining the term "livestock farming" contained in a scenic easement was an ambiguous term.  United States v. Park, 536 F.3d 1058 (9th Cir. 2008).

2. Currently, there are approximately 240 landowners with easement encumbered properties on the Middle Fork Clearwater, Lochsa and Selway Wild and Scenic Rivers. Over three million dollars were spent by the United States in the 1970's and 1980's to acquire these scenic easements, including the easement which is the subject of this litigation.  Mr. Gerald Curnes negotiated over 140 scenic easements for this area over a

MEMORANDUM DECISION AND ORDER - 1

10 to 12 year period.  Mr. Curnes specialized in  real estate transactions for the Forest Service and he drafted the scenic easements.  He then had his easements reviewed by general counsel for the Forest Service.  Mr. Curnes used the same basic format for the easements, but provided for existing uses on each property and would include unique clauses when appropriate.

3. The private property at issue is located within the Designated Boundaries of the Middle Fork Clearwater Wild and Scenic River.  (Parts of Lot 8, Section 6, Township 32 North, Range 5 East, Boise Meridian).  The United States refers to this parcel as Tract 160A.

4. The United States purchased certain real property rights on this property under the authorities of the Wild and Scenic Rivers Act (P.L. 90-542) in March 1973, as recorded with Instrument Number 248999 in Idaho County, Idaho. Exhibit 1.

5. The United States paid Earl and Iona Monroe $49,500 for the easement in 1973.  Id. The easement applied to 94.7 acres of land.  Id.

6. The Monroes sold to the property to the Dells in June, 1984.  Exhibit 2A.  The Dells sold the property to the Daileys in June, 1987.  Exhibit 2B.  The Daileys sold the property to Ronald and Mary Park (the "Parks") in April 1989.  Exhibit 2C.  At the time the property was sold to the Parks no kennels existed on the property. Exhibit 17.  The Parks were aware of the easement encumbering the property prior to their purchase of the property.

7. The easement requires written approval prior to construction of structures within the easement area.  Clause 2(d)(1) of the easement states "The location and architectural

MEMORANDUM DECISION AND ORDER - 2

design of such structures shall be harmonious with the landscape and general surroundings.  Architectural and site plans must be approved in writing by the Secretary of Agriculture or his duly authorized representative prior to construction, erection, or placement of new or additional structures." Exhibit 1, clause 2(d)(1).

8. The easement prohibits certain commercial uses.  Clause 2(a) of the easement states ". . . the lands within the easement area shall not be used for any professional or commercial activities except such as can be and are, in fact, conducted from a residential dwelling without outside alteration of the dwelling."   Exhibit 1, clause 2(a).

9. The Monroe easement allows for "general crop and livestock farming."  Exhibit 1, clause 2(c).  This same clause was used in most of the residential easements negotiated.

10. The Monroes were involved in general crop and livestock farming at the time the easement was signed, but the Monroes did not have any kennels on the property at the time the easement was granted.  The Monroes did have cattle and horses on the property. The Monroes did not have an attorney involved in negotiations with the Forest Service for the easement.  The Monroes did not indicate any specific interest in retaining a right to have a dog kennel on their property or to run a dog kenneling business in the future. Mr. Curnes does not remember noticing a dog on the Monroes' property when he negotiated the easement and does not recall whether there was or was not a dog or dogs on the Monroe property at the time the easement was negotiated.

11. The Administrative Plan that was created with the Monroes to manage the easement's application to their property contains no reference to dogs or cats, or kennels.  Exhibit 3.

MEMORANDUM DECISION AND ORDER - 3

The Monroes' Administrative Plan does not place restrictions on the types of animals that could be on the Monroes' property.   Administrative Plans were not required for scenic easement properties, but were drafted to give the landowners assurances about the type of uses they could have in the future.

12.  Between February 1989 and December 1991 the Parks communicated with the Forest Service as required by the easement to obtain approval for various structures and commercial uses.  Exhibits 5, 6, 8 and 9.

13.  In particular, approval was sought and granted in November 1989 to excavate behind the chicken coop for the purpose of constructing open horse stalls, constructing a 4-foot tall retaining wall, converting the chicken coop to a barn, constructing a 15-foot addition to the machine shop and excavating a small pond.   Exhibit 6.

14. In August 1990, approval was given to operate a craft and hobby shop within the residence.  Exhibit 8.

15. In December 1991, approval was given to operate a bed and breakfast within the residence.  This same letter denied conversion of an existing structure into additional living quarters because that use would violate easement clause 2(a) described in item 6 above, which prohibits commercial activity outside the residence.  Exhibit 9.

16. In May 1997, the Forest Service observed advertising in the local newspaper for "Wild River Kennels Dog Boarding & Training.  208-926-7146."  This phone number is the Parks'.  Exhibit 10A.

17.  The Parks refer to their business as a "Doggie Bed & Breakfast."  Exhibit 10B.

MEMORANDUM DECISION AND ORDER - 4

18.   The Parks have continued to advertise their dog kenneling operations and have

expanded their operations to include the boarding of cats.  Exhibits 10 A- E.

19. In February 1998, the Forest Service notified the Defendants in writing that the kennel

construction and operation were not in compliance with the easement because no plans

for dog kennels were approved per easement clause 2d(1) and the commercial operation

of the dog kenneling business was prohibited by easement clause 2a.  Exhibit 11.

20. Ron Park testified that he believed the kennels were approved in 1998 as horse stalls

and that dog boarding and training are general livestock farming permitted under

easement clause 2(c) which states that "the Grantors . . . retain the right to use the

easement area for general crop and livestock farming and for limited residential

development consistent with applicable State and local regulations."  Exhibit 1.

21. In February 1999, the Forest Service notified the Defendants in writing for the second

time that the kennels and kenneling operations were not in compliance with the easement.

Exhibit bb, attachment G, Forest Service Letter to Ron and Mary Park dated February 4,

1999.

22. In the summer of 2003, the United States observed the presence of three newly

constructed kennels and signage for the Parks' business.  The United States notified the

Defendants for the third time that the kennels and kenneling operations were not in

compliance with the easement.  Exhibit 13.

MEMORANDUM DECISION AND ORDER - 5

23. The Forest Service notified the Parks a fourth time in writing with details of the specific easement violations outlining the actions needed to remedy the violations and timelines.  Exhibit 14.

24. On  July 21, 2005 the parties attempted to mediate the dispute.  The Parks' agreed to remove the neon signage.  No resolution was reached regarding the definition and interpretation of "general crop and livestock farming" as used in easement clause 2c.

25. There were no "commercial" kenneling operations in the town of Kooskia in the early 1970's when the easement was granted.

26. The newspaper from that community in 1972- 1973, "The Clearwater Progress," does not reflect whether dogs were considered livestock.  Exhibits 29 A-G.

27. At the time he negotiated the scenic easements, Mr. Curnes did not consider dogs to be livestock.  Mr. Curnes did  not remember discussing with the Monroes what animals they considered to be "livestock."   Mr. Curnes considered horses, cattle, sheep, goats, pigs "livestock" when the easement was entered.  He considered chickens, ducks and rabbits not as "livestock" but allowed under the easements under the reserved activity of "farming."  Mr. Curnes did not include these definitions in scenic easements he negotiated and drafted.

28. At the time the easement was negotiated with the Monroes, a similar easement was negotiated with the landowners across the river, Billy and Katie Hopson.  At the time the easement was signed by the Monroes, Mr.Hopson had dogs and two kennels on his property.  Mr. Hopson bred his dogs and sold puppies occasionally.  Mr. Hopson's

MEMORANDUM DECISION AND ORDER - 6

easement contained the same clause which allowed the property owner to use his property

for "general crop and livestock farming."  Exhibit I.  At the time Mr. Hopson entered his

easement he had a few cows, three horses, rabbits (with numerous hutches) and three

dogs on his property.  The Forest Service never contested Mr. Hopson's right to have

dogs, kennels, rabbits or rabbit hutches on the property and he lived on the property until

1998.  Mr. Hopson's easement was negotiated for the Forest Service by Mr. Mel Fox

although he also talked with Mr. Curnes regarding the price to be paid for the easement.

29. The testimony received by the Court from the experts was conflicting.  The

Government's expert, Dr. Jeff Rosenthol, veterinarian and Chief of Staff for the Idaho

Humane Society, testified:

     a) Dogs are not considered "livestock" under Idaho law.  "Livestock" is a broad

term, but not a technical term so it is subject to certain ambiguities.  "Livestock"

generally refers to animals used in the agricultural economy for producing food and fiber

for humans such as cattle, sheep, goats, pigs, poultry and horses.   Just because a dog

works on a farm (such as a herding border collie), does not mean that a dog can be

classified as livestock *per se*.   Hunting dogs are not generally used in the husbandry of

animals kept for food and fiber.

     b) "Livestock" does not include domestic dogs.  Livestock sales are not generally

held for dogs although dogs may be posted for sale at livestock sales. Dog breeders and

breed fanciers are not considered livestock farmers.  Animal shelters for dogs and cats are

not defined as an agricultural facility or farm.

MEMORANDUM DECISION AND ORDER - 7

c) Title 25 of the Idaho Code distinguishes between "production animals" (cattle, sheep, pigs, goats, poultry, furbearers, horses) and "companion animals" (dogs, cats, companion birds, rabbits). There is no definition of livestock in Title 25 that includes domestic dogs.

d) "Livestock" is a term seldom used in veterinary textbooks.

30. The Parks' expert Dr. Lawrence Fox, a veterinarian who is also a professor of veterinary clinical sciences and animal sciences who conducts livestock production research, testified as follows:

a) Cole's Livestock Production textbook defines livestock as "agricultural animals used for food, fiber or work." McDowell at Cornell University taught Dr. Fox that "livestock improves the use of land." In Cole and Garrett's latest textbook on livestock production, the definition of "livestock" has broadened to include emus, birds and dogs. Originally, "livestock" did not include dairy and poultry.

b) There is some ambiguity as to what animals are considered livestock. Bison at the zoo are zoo animals, but bison raised on a ranch would be livestock.

c) He would define "livestock" as animals that are kept for food, fiber or work but acknowledges that the list of animals included is expanding and dogs are now considered livestock. Domestication of the agricultural animals intended to be profitable for humans is ambiguous and is an evolving term.

d) The definition of "livestock" used at the time the easement was granted would be Coles' definition: animals used for food, fiber or work.

MEMORANDUM DECISION AND ORDER - 8

31.  The testimony of Dr. Stephen Cooke, agricultural economist, can be summarized as follows:

a) The Forest Service is a subdivision of the United States Department of Agriculture ("USDA").  The USDA's definition of agricultural activities includes dog production and dog kenneling.  The Census of Agriculture has included a category for livestock under animal production and dog production is included in "other animal production" category (NAICS Code 1129).  The type of dog production is further broken down for pets, companion animal production, kennels, breeding and raising stock for sale.

b) This categorization of "dog kenneling" as "other animal production" for agricultural purposes has not changed since the easement was entered.

c) Parks submit with their tax returns an 11-2990 designation for other animals production for their dog kenneling activities.

d) Kenneling dogs without breeding dogs is still an agricultural activity under the USDA definitions if the kenneling involves training.  Kenneling without training is a pet sitting and is more of a personal service.

e) Sheltering animals as a non-profit activity is not an agricultural activity.

32. The testimony of Dr. Paul McCawley was given less weight by the Court than the other expert witnesses as Dr. McCawley personally knows the Parks, has competed in dog trials with the Parks and shares their interest in being allowed to keep kennels on their property.  Dr. McCawley has worked for the USDA for numerous years and was an professor at the University of Idaho, College of Agriculture and Live Sciences, testified

MEMORANDUM DECISION AND ORDER - 9

as follows:

a) "Livestock" is an imprecise term. The definition of livestock is evolving in response to social and cultural changes so that more animals are included in the definition than in the past.

b) In his opinion, the easement was not specific enough regarding animals and there is no language in the easement excluding dogs from being kenneled or raised on the property.

Analysis

1.  Interpretation of the Scenic Easement

A.  Does the term "livestock" include dogs?[1]

The Ninth Circuit ruled the easement prohibited "commercial activity except to the extent that such activity qualified as 'general crop and livestock farming.'"  United States v. Park, 536 F.3d 1058 (9th Cir. 2008).  The Ninth Circuit further ruled the scenic

---

[1]There was testimony that the Parks are also boarding cats on their property.  Cat boarding was not discussed as being an issue for the Court to decide when the matter was remanded by the Ninth Circuit.  Further, it was unclear from the testimony if the cats are boarded in the residence or outside the main residence.  The easement allows for commercial activity within the residence (such as a bed and breakfast) subject to the approval of the Forest Service.  While it does not appear from the correspondence submitted as exhibits that the Parks sought approval from the Forest Service for cat boarding, the Court declines to expand the legal issues on remand.  Accordingly, the Court will only determine whether dogs are considered livestock under the scenic easement.

MEMORANDUM DECISION AND ORDER - 10

easement was ambiguous regarding the definition of the term "livestock" as the term was not defined within the four corners of the easement and there was a lack of a uniform definition of "livestock." Id. at 1064.  Where the terms of a contract are ambiguous, the interpretation of the contract's meaning is a question of fact.  Brown v. Perkins, 923 P.3d 434 (Idaho 1996).  The question for this Court to answer is whether based on the evidence received can a dog kenneling business on the property subject to the scenic easement be considered "livestock farming" which is specifically allowed under the terms of the easement.

 B.  What was the Intent of the Parties?

 The Court will attempt to arrive at the real intention of the parties over thirty five years ago and will consider the facts and circumstances out of which the easement arose and will construe the easement in the light of such facts and circumstances.  Werry v. Phillips Petroleum Co., 540 P.2d 792, 798 (Idaho 1975)

 The Court follows state law to resolve property disputes, such as an interpretation of an easement.  Park at 1061.  Under Idaho law, this Court must construe the easement to "give effect to the real intention of the parties."  Benniger v. Derifield, 129 P. 3d 1235, 1238 (2006).  Having found the language in the easement to be ambiguous as to the definition of "livestock farming" the Court must try to determine the intent of the parties who granted and purchased the easement.

MEMORANDUM DECISION AND ORDER - 11

The easement process took 10 to 12 years to complete.  Each of the 140 easements was individually negotiated and included unique and separate clauses based on the existing uses of the real property at the time of the easement.  Many of the easements granted contain a reserved right for "general crop and livestock farming."  The unique clauses as well as each final version of the negotiated easement were approved by one of the four Forest Service Districts involved in this scenic wilderness corridor referenced in the  Designated Boundaries of the Middle Fork Clearwater Wild and Scenic River.

None of the experts that testified had first hand knowledge of the intent of the parties for the term livestock when the easement was entered.  The Monroes are no longer available to testify.  The Forest Service employee who negotiated the easement with the Monroes and other property owners, Mr. Curnes, said the matter of dogs and kennels was not discussed and that he did not recall observing any dogs on the property when he visited the Monroes.  Mr. Hopson testified that he lived across the river at the time the easement was granted to the Monroes and that he had dogs and kennels on his property at that time.  Additionally, other property owners in the scenic river corridor had dogs at the time the easements were granted as hunting dogs and dogs owned for pleasure were not uncommon.

While it may be true there were no dog kennel businesses advertised in the general area at the time the easement was granted, it remains unclear what the intent of the parties was since the definition of the term "livestock" was never discussed and yet it was standard language used in most of the scenic easements purchased by the Forest Service.

MEMORANDUM DECISION AND ORDER - 12

Moreover, there were property owners with dog kennels when the easements were entered.  If dogs were used for herding cattle or sheep, those dogs could arguably be considered livestock as they were dogs kept for work on the farms.  The bottom line is that the intent of the parties is not clear.  Since the term was not defined or discussed, the testimony of Mr. Curnes regarding his interpretation of the term "livestock" is not helpful in determining if there was a mutual agreement with such definition by the Monroes.

The Forest Service argues that the intent of the Monroes should be gleaned from the Administrative Plan they negotiated with the Forest Service.  The Court finds the Administrative Plan is unpersuasive in establishing the intent of the Monroes and the Forest Service as that document is silent as to the types of animals that would be allowed on the property.  The Court also finds the newspapers from that time period are not helpful in determining whether or not dogs were considered livestock.

If Forest Service intended not to include or exclude certain animals, they could have defined the term "livestock" or specifically excluded certain animals from being considered livestock under the easement.  The Forest Service did neither of these actions, yet it was responsible for drafting the easement.


C.  Does State Law Define Dogs as Livestock?

The Court will next determine if Idaho's statutes can shed light on the parties' intent as to whether dogs are livestock.  The Court finds Idaho state law is unpersuasive in helping define the term "livestock" in this case since the easement document did not

MEMORANDUM DECISION AND ORDER - 13

incorporate certain state definitions and the state statutes that do define "livestock" for branding purposes do not appear to be applicable to facts before the Court.

Pursuant to Idaho Code § 25-1101, "livestock" is defined as "any cattle, horses, mules or asses." This definition is limited to Title 25 which deals with the State brand board.  This definition is more limited than any definition used by the experts that testified.  Additionally, common sense would indicate that a branding statute would not include dogs in its definition as dogs are not animals that are branded.  The Court could not locate any state statute that defined dogs as livestock, however the Court could not locate any state statute that indicated dogs were not livestock.  The Forest Service argues because dogs were not included in the definition of livestock in § 25-1101, they are excluded.  The Court respectfully disagrees with this argument as it is clear from intent of the  statute that the purpose of the statute was not to define an all inclusive list of livestock.  Moreover, the testimony of all the experts and Mr. Curnes (who negotiated the easement) supports a finding that "livestock" is not limited to cattle, horses, mules and asses.  Based on the expert testimony, "livestock" certainly includes goats, llamas, sheep, pigs, hogs and poultry but these animals are not normally branded so they are not included in the branding statute definition for livestock.

Finally, the Ninth Circuit held that the easement did not incorporate any provision of the Idaho Code, so the Court is not compelled to look to the Idaho Code for a definition of "livestock" as opposed to considering plain meanings found in dictionaries. Id. 1063.

MEMORANDUM DECISION AND ORDER - 14

D.  Do Dogs Fit Under the Plain Meaning of the Term "Livestock"

Having found state statues unhelpful, the Court will turn to the plain meaning of the word "livestock."  As the Ninth Circuit noted, "[t]he term"livestock" stems from the Middle Ages, when it was used as a measure of wealth or to refer to property that could be moved, particularly to a market for trade. . . . Later, the term began to be used in a more limited sense to describe cattle. . . .Today, dictionary definition of "livestock" is sweeping, capturing every type of domesticated animal."  United States v. Park, 536 F.3d 1058, 1062 (9th Cir. 2008)(citations omitted).

Webster's Dictionary defines "livestock" as "animals kept or raised for use or pleasure; *esp*:  farm animals kept for use and profit."  Merriam-Webster Collegiate Dictionary 728 (11th ed. 2003).  Black's Law Dictionary defines "livestock" as "domestic animals and fowls that (1) are kept for profit or pleasure, (2) can normally be confined within boundaries without seriously impairing their utility, and (3) do not normally intrude on others' land in such a way as to harm the land or growing crops."  Black's Law Dictionary 953 (8th ed. 2004).

In trying to determine the intent of the parties entering the easement in 1973, the Court also examined earlier published definitions of "livestock."  In Ballentine's Law Dictionary 746 (3rd ed. 1969), the term "livestock" is defined as:

> Domestic animals, particularly cattle, hogs, sheep and horses.  Livestock includes fur bearing animals domesticated, and raised in captivity.  The breeding, raising and pelting of foxes is agricultural labor as that term is used in the Social Security Act.  Fromm Bros. v. United States (DC Wis) 35 F.145.

MEMORANDUM DECISION AND ORDER - 15

<u>Black's Law Dictionary</u> 1083 (4th ed. 1968) defines "live stock" as:

> Domestic animals used or raised on a farm.  <u>Boland v. Cecil</u> 65 Cal. App.2d 832, 150 P.2d 819, 822. The term in its generic sense includes all domestic animals.  <u>Meader v. Unemployment Compensation Division of Industrial Accident Board</u>, 64 Idaho 716, 136 P.2d 984, 987 [1943].  It includes fur bearing animals raised in captivity.  <u>Fromm Bros. v. United States</u>, D.C. Wis. 35 F. Supp. 145, 147.

In <u>Meader</u>, the Idaho Supreme Court held that for purposes of the state Unemployment Compensation Law, the definition of "livestock" was limited to the livestock listed in the statute and not the broader generic definition of livestock which would include "the propagation and rearing of all domestic animals, which, it may be conceded here, includes domestic trout."  64 Idaho 722.  This generic definition of livestock in 1948 is  relevant to the issue before this Court, even though the holding in <u>Meader</u> was that domestic trout were not livestock under a particular Idaho Unemployment Compensation statute.  Arguably, <u>Meader</u> supports a broad definition of the term "livestock" where such term is not otherwise limited by another statute.  This broad definition is consistent with the expert testimony that the term "livestock" is an evolving term.

In applying these definitions, the Court finds that dogs can be considered livestock in the generic sense of the word.  Dogs are domestic animals.  Certainly, the kenneling or breeding of dogs could be considered the keeping of farm animals kept for profit.  It is undisputed that dogs can be kept for profit or pleasure – working dogs versus pure family pets.  Dogs can normally be confined in kennels without impairing their utility and that dogs in kennels would not be able to intrude on the land of others.  Further, the USDA's

MEMORANDUM DECISION AND ORDER - 16

definitions for agricultural activity which livestock farming would be in 1973 included

other animal production which included dog breeding and kenneling as agricultural

activities.  Finally, the court in Levine v. Conner, 540 F. Supp.2d. 1113, 1116 (N.D. cal.

2008) held "the scope of domestic animals used or raised on a farm can potentially extend

to guinea pigs, cats, dogs, fish, ants and bees."[2]

     The experts agree that working dogs can be part of the livestock farming process.

While "livestock" may be an evolving term, dogs probably played a bigger part on

ranching operations when the easement was signed that they do now because of

downsizing and increased mechanization on ranches and farms.  Owning, kenneling and

breeding hunting dogs is common in the District of Idaho.  Hunting dogs are often bred

for profit and can even be used on hunting farms.  As the Forest Service's expert testified,

dog sales do occur at livestock sales although not frequently.  Many people now (and

when the easement was entered) raise dogs for profit for dog shows, specialized breeding,

working dogs and hunting dogs.  For these reasons, the Court finds that under a plain

meaning of the term "livestock" as such was defined at the time the easement was

---

     [2]The Court notes it did find one case from Tennessee in 1926 which the court held
"livestock" means domestic animals used or raised on a farm, especially cattle, sheep and
hogs and does not include dogs.  Howard & Herrin v. Nashville, C. & St. Ry. Co., 284
S.W. 894 (Tenn 1926) (hunting dog owner brought suit for hunting dog which was killed
by railcar and court determined dogs were not included in the definition of "livestock"
under a particular railroad statute.)  The Court finds this Tennessee case distinguishable
from the case at bar.  The Court also found several cases where dogs attacking other
livestock such as cattle are not considered livestock, but the facts of those cases are also
distinguishable from the case at bar.

MEMORANDUM DECISION AND ORDER - 17

granted, dogs can be considered livestock under the facts of this case since the dogs

involved are not merely family pets, the dogs are bred for profit occasionally and are

hunting dogs which is a form of working dogs allowed under the broad definition.

Finally, kenneling dogs for profit is similar to renting property for pasturing horses and is

a type of livestock farming.

The Court also finds the expert testimony generally supports the plain meaning of

the word "livestock" applied by the Court.  Both Dr. Rosenthal and Dr. Fox agreed that

"livestock" included animals used in the agricultural economy for food, fiber or work.

Dr. Fox testified that "livestock improves the use of land" and the breeding and kenneling

of dogs improves the use of the agricultural land in the case at bar.


E.  Do the Rules of Contract Interpretation Support a Broad Definition of

"Livestock?"

Having found that dogs can be livestock in certain situations, the Court must

determine if this broad, plain meaning definition is consistent with the rules of

construction for an ambiguous term in a contract.  The rules of construing contracts also

supports the Court's conclusion that a broad, inclusive definition of livestock should be

applied in this case.  Any ambiguity that remains after trying to determine the intent of the

parties from the extrinsic evidence should be interpreted against the drafter of the

contract.  Farnsworth v. Dairymen's Creamery Ass'n, 876 P.2d 148, 152 (Ct. App. 1994)

(citing 3 CORBIN ON CONTRACTS § 559 (1960).   This is because ambiguous

MEMORANDUM DECISION AND ORDER - 18

language in a contract is ordinarily construed liberally and most strongly in favor of the party who did not write or prepare the contract and who therefore is not responsible for the ambiguity.  Stated another way, when there are two possible and reasonable meanings which could be adopted, the court should adopt the one which is the least favorable in its legal effect to the party who chose the words.  Id.

In this case the Court received no evidence regarding the sophistication or lack of sophistication of the Monroes regarding land use easements.  There was testimony that Mr. Curnes had received specialized training in real estate issues for the Forest Service and that he negotiated over 100 of these easements over the 10 to 12 year period. Additionally, Mr. Curnes had the benefit of general counsel for the Forest Service reviewing the easements before they were executed.  As to the Monroes, it was testified to that the Monroes did not retain legal counsel when negotiating the easement for their property and did not make changes to the proposed language of the Forest Service.  The Monroes simply signed the easement proposed by the United States.  Hence, the negotiations were arguably not between two equally situated parties and the ambiguous term should be interpreted in favor the non-drafting party.

F.  Conclusion

It is clear from the evidence, that neither party to the scenic easement expressed an intent as to whether dogs should be considered "livestock."  The Court concludes that dogs are livestock or pets depending on their purpose and/or usage.  Like the example of

MEMORANDUM DECISION AND ORDER - 19

the bison being considered at times livestock and at times zoo animals, the Court finds

dogs are at times livestock when they are used for work on a farm such as herding

animals, or used for profit when dogs are bred for sale or used for hunting.  A dog could

be considered livestock when it is being kenneled for profit just like pasturing horses for

profit.  While it is true that dog kenneling can be also commercial activity, it is a type of

commercial activity allowed under the broad reservation for "general crop and livestock

farming."

Of course a dog can also be on real property without being livestock.  A family

dog that does not work on the farm, is not bred, or is not used to help produce food when

a person hunts, is just a family pet and is not livestock.  Under the facts of this case, the

Court finds that the dogs being used on the easement property for breeding, hunting and

boarding are dogs being used for work and/or profit and can be considered "livestock"

under the plain meaning of the term livestock.  Moreover, this conclusion is consistent

with the rules of contract construction when the term is ambiguous and the Court cannot

determine the parties' intent.

In interpreting the easement to include a broad definition of the term "livestock"

which would include working dogs and dog kenneling, the Court also finds that the

purpose of the scenic easements is not negatively impacted by this interpretation.  The

kennels on this property are out of eyesight from the road and do not distract from the

natural beauty of the protected river corridor.   The Forest Service maintains its right to

control the building of structures on the easement areas and this control will prevent

MEMORANDUM DECISION AND ORDER - 20

abuses of the purpose of the scenic easements. The Court is mindful that the Forest Service's intended to limit the commercial activities (outside the residence) on the residential properties to maintain a scenic corridor, however the Forest Service specifically granted the residential property owners the right to conduct certain commercial activities that fall under the clause "general crop and livestock farming" in the scenic corridor. While it is unfortunate that the term "general crop and livestock farming" was not specifically defined and limited in the easements, the Court must enforce the easement as written.

2. Were Property Modifications Approved by the Forest Service?

The next issue for the Court to decide is whether the modifications to the property were authorized under the terms of the easement. The Court finds the Defendants did not comply with the terms of the easement with regard to the expansion of the barn and kennel area. Just because the Court has determined the Parks have the right under the terms of the easement to have dog kennels, that does not mean the construction of such kennels is not subject to the approval of the Forest Service. The easement specifically provides that the retained right for "general crop and livestock farming" is subject to certain conditions set forth in Section 2.c. (1) - (5). The subsections at issue in this case are (4) and (5) which provide:

> (4) No commercial buildings, multi-family residential buildings, or other industrial or commercial structures shall be erected on said land, and not more than one residential dwelling with appropriate accessory structures shall be permitted

MEMORANDUM DECISION AND ORDER - 21

on a given lot.
    (5) Hereafter, no structures shall be placed within 100 feet of U. S.
Highway 12, or between this road and the river, except as may be authorized in
writing by the Secretary of Agriculture or his duly authorized representative.

It is undisputed that the dog kenneling occurring on the property is at least partially a

commercial activity.  The Court acknowledges the Parks also perform some charitable

work regarding dog rescues, but the advertisements presented at trial, clearly establish

the dog kenneling business is a commercial activity.  Therefore, the commercial

buildings, i.e. the kennels are subject to subsections (4) and (5) which require the Parks to

receive written authorization from the Forest Service for construction of such structures.

    While the Parks claim they tried to get approval, the record does not support that

such requests were made in good faith.  The documents reflect that Mr. Bledsoe approved

"stalls for horses" and there was no mention of dog kennels so the current claim that Mr. .

Park was requesting "a place for animals" not horses is disingenuous.  Defendant's letter

to Lane, Exhibit N, indicates in 1998 he was seeking to board and train horses, not dogs.

Mr. Parks testified that pursuant to discussions with Mr. Griffiths, he thought he could

build it any way he wanted.  Mr. Park also testified he had "carte blanche behind the

school house" to do whatever he wanted.

    Mr. Parks belief he could construct whatever he wanted is clearly a violation of the

express terms of the easement. His statements are in direct conflict with the terms of the

easement, and Mr. Park was not making changes to the property in good faith.  Mr. Parks

is a sophisticated businessman who was aware of the easement before he purchased the

MEMORANDUM DECISION AND ORDER - 22

property and cannot ignore terms of the easement when it does not suit him.  Exhibit 25A.

It is undisputed in this case that the modifications to the property by the Parks have improved the overall look of the property from when the Monroes owned the property.  In a chambers discussion with counsel, the counsel for the Forest Service represented that the Forest Service would not be seeking to have the Parks tear down the alleged unauthorized commercial structures existing on the property.  Accordingly, this issue may now be moot as to the current structures, but the Parks are hereby enjoined from making any additional improvements to the property without the prior approval from the Forest Service as set forth in the easement.  This prior approval is required for additional improvements even if such improvements are related to general crop and livestock farming.  If the Parks fail to comply with the approval process, the Forest Service would be within their rights under the easement to have any structures not properly approved to be removed at the landowners' expense and the property restored to its state before unauthorized improvements were done.

3.  Does the Forest Service have Access to the Property?

Finally, the Parks complain the Forest Service is improperly coming onto their property for inspections.  While it is normally the policy of the Forest Service to notify and get permission of the landowners prior to going on easement property, the easement gives the Forest Service the right to come onto the property without permission.  The

MEMORANDUM DECISION AND ORDER - 23

Parks complaint regarding the Forest Service's inspections of the property are without merit.

4. Motion for Leave to File An Amended Complaint

The United States has moved to file an amended complaint to modify its requested relief to no longer include the removal of the large barn erected by the Parks and add a third violation related to the Parks operation of a German Short Haired Rescue Ranch on the property.  The Parks do not contest the modification of the requested relief, but argue the addition of the third alleged violation is untimely.  The Court agrees that the amendment is not timely.

The Court heard limited testimony regarding the non-profit dog rescue operation being run by the Parks.  Based on the Court's ruling that dogs are included under the term livestock, the rescue operation would be allowed under the terms of the easement. Moreover, the Court's ruling also allows the large barn to be used for livestock purposes. Accordingly, the amendment would be futile and the motion to file an amended complaint is denied.

MEMORANDUM DECISION AND ORDER - 24

Order

Being fully advised in the premises, the Court hereby orders that the Forest

Service's claims for declaratory and injunctive relief are granted in part and denied in part

consistent with this Order.  The Forest Service's claims for damages are denied.

DATED: **September 11, 2009**

Honorable Edward J. Lodge
U. S. District Judge